**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **ETHOR IP CORPORATION**<br>Plaintiff<br><br>v.<br><br>**HUNGERRUSH LLC f/k/a REVENTION, MENUFY.COM LLC,** and **MENUFY.COM LLC f/k/a ORDERINGIN.COM LLC**<br><br>Defendant | **CIVIL ACTION NO. 4:23-913**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

Plaintiff Ethor IP Corporation ("Ethor") alleges—for its Complaint for patent infringement against HungerRush LLC, Menufy.com LLC, and Menufy.com LLC f/k/a OrderingIn.com LLC (collectively "Menufy Companies")—the following:

### THE PARTIES

1.      Plaintiff, Ethor IP Corporation, is a Delaware corporation.  Plaintiff is the owner, by assignment, of U.S. Patent No. 10,460,363.

2.      Defendant HungerRush LLC f/k/a Revention ("HungerRush") is a Delaware limited liability company with its principal place of business at Westview Business Park, 1315 West Sam Houston Parkway North, Suite 100, Houston, Texas 77043.  It may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900,

Dallas, TX 75201, or it may be served using any other lawful means.

3.      Defendant Menufy.com LLC is a Kansas limited liability company whose principal office is 1315 W Sam Houston Pkwy N Suite 100, Houston, Texas 77043. Menufy.com LLC may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201, or it may be served using any other lawful means.

4.      Defendant Menufy.com LLC was formerly known as OrderingIn.com LLC.

5.      Collectively Menufy.com LLC formerly known as OrderingIn.com LLC and Menufy.com LLC are referred to as "Menufy."

6.      HungerRush LLC is registered to do business in Texas. HungerRush LLC wholly owns Menufy.

7.      Menufy is registered to do business in Texas.

8.      Upon information and belief, Menufy.com LLC formerly known as OrderingIn.com LLC is a predecessor to Menufy.com LLC. Menufy is authorized to transact business, has transacted business, and at least as recently as April 2022 continued to transact business, in Texas.

9.      Menufy and HungerRush are referred to collectively as the "Menufy Companies."

10.     Menufy operates, and sells as a service, a platform for placing orders online. HungerRush sells and offers for sale the Menufy platform (e.g., "Menufy by HungerRush").

## JURISDICTION AND VENUE

11.      Ethor brings this action for patent infringement under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

12.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).  HungerRush and Menufy do business in this judicial district, have committed acts of infringement in this judicial district, have purposely sought and transacted business in this judicial district involving the accused products, and have a regular and established place of business in this judicial district.  HungerRush's headquarters are in this judicial district.

13.      HungerRush and Menufy are subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Texas Long-Arm Statute, due at least to its substantial business in this State and judicial district, including: (a) at least part of its infringing activities alleged herein; and (b) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from goods sold and services provided to Texas residents including in this district.

14.      Menufy maintains a principal office in Texas.  Menufy has represented to the Texas Secretary of State that its principal office address is 1315 W Sam Houston Pkwy N Suite 100, Houston, Texas 77043.

| 8.  The principal office address of the limited liability company is: | | | | |
|---|---|---|---|---|
| 1315 W Sam Houston Pkwy N Suite 100 | Houston | TX | USA | 77043 |
| *Address* | *City* | *State* | *Country* | *Zip/Postal Code* |

*Menufy.com, LLC Application for Registration of a Foreign Limited Liability Company.*

15.      Menufy filed its Application for Registration of a Foreign Limited Liability Company subject "to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

---

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:        4/11/2022

/s/ Matthew Hoeg
Signature of authorized person (see instructions)

---

*Menufy.com, LLC Application for Registration of a Foreign Limited Liability Company.*

### Ethor IP

16.      Ethor IP Corporation is the owner by assignment of the U.S. Patent No. 10,460,363.   Ethor IP was founded by Gary Ziegler, who is a pioneer in point-of-sale software. Mr. Ziegler's customers include Ruby Tuesday, Smith & Wollensky, and Portos Bakery, among others.

17.      Mr. Ziegler earned acclaim for his solutions in the point-of-sale space including his early work in solving the problem of integrating diverse point of sale systems and providing scalable solutions using cloud computing long before his peers.

18.      The '363 Patent was issued by the United States Patent and Trademark Office on October 29, 2019, and is titled "System, Method, and Computer Program for Integrating

Diverse Point of Sale Systems." *See* Exhibit A.

19.     The '363 Patent generally pertains to integrating diverse point of sale (POS) systems, a technical problem that arises in the retail industry.

20.     Application No. 12/870,420 ("420 Application"), filed on August 27, 2010, issued as the '363 Patent.

21.     In 2010, significant technological challenges impacted the retail industry because of fractured point of sale system infrastructure.  Retailers (including franchises) commonly used diverse point of sale systems.

22.     Problems arose when retailers (including franchises) wanted to do something as a single unit, such as online ordering.  For example, a franchise might have five diverse point of sale systems being used throughout their chain.  Prior to the invention, to provide a unified online ordering system that works with all their stores, the franchise would have to implement five different custom integrations with five diverse POS systems, none of which "talk" to each other or are integrated with each other in any way.  As a result, retailers desiring to offer online retailing cannot easily leverage point of sale data in a unified manner that is already available to them.

23.     One of the problems was that POS systems were too different from one another to effectively share information, work together and utilize data structures that were different from one another. Then-existing solutions failed to centralize access to POS data in an efficient way which led to disorganized, inefficient management of the data.

24.     For example, at the time POS systems could be configured to structure a restaurant's menu items, modifiers, combos, pricing or discounts in a variety of different

ways.  Although this flexibility of POS configuration offered restaurants the ability to configure their POS however they wanted, the result was that the configuration created a problem when trying to take those unique data structures from each restaurant POS and use them in an effective way for online ordering, promotion, or other activities.

25.     Disorganized POS data presented practical problems for retailers.  For example, a franchise utilizing different POS systems at different locations will need to access both of those systems to comprehensively understand the retailer's sales activity.

26.     For retailers with larger numbers of POS systems, the time and effort spent accessing each of those systems is even greater and imposes correspondingly greater burdens.

27.     For companies interested in merging with, acquiring, or being acquired by, one another, their different POS systems meant that assuming the burdens would be an unavoidable aspect of moving forward with the desired merger or acquisition.  This issue compounded with each new system that was added with then-existing POS systems.

28.     Then-existing solutions were unable to leverage POS data for online promotion without encountering difficulties relating to the incompatibility of the data between different POS systems.

29.     Ziegler and his co-inventor, Andrew Finall, conceived of a novel solution: by relying on a "system/agent" insight, Ziegler and Finall unlocked the potential for an unconventional, centralized architectural improvement over then-existing solutions.

30.     The unconventional combination of point-of-sale agents with corresponding point-of-sale systems enabled an unconventional architecture that further comprises an

order manager and a common data model.

31.    The '363 claims neither describe nor claim a concept or a generic computerized system and instead the claims address, among other things, a persistent problem unique to the retail industry at the time of the invention whereby brick-and-mortar retailers with both legacy POS systems and an e-commerce platform encountered the original problem of POS systems being too different from one another to effectively share information, work together, or permit seamless online ordering. The '363 claims address unique shortcomings of the then-existing solutions to that original problem.

32.    In June 2019, the Patent Trial and Appeal Board held that the 420 Application (later issued as the '363 Patent) claimed an invention that "reflect[s] a technology improvement of integrating diverse systems, so that non-compatible data from diverse systems are mapped to a common data model for centralized access."

33.    A person of ordinary skill in the art at the time of the invention would recognize the arrangement of components claimed by the '363 Patent as unconventional and would understand that the conventional way of accommodating diverse POS systems (ad hoc, custom integrations) was time-consuming, tedious, and error prone.

34.    The novel use and arrangement of the specific combination, steps, system, and devices recited by the '363 Patent were not well-understood, routine, or conventional to a person skilled in the relevant field at the time of the inventions.

35.    In particular, the combination of steps in at least Claim 1 of the '363 Patent were not well understood, routine, or conventional to a person of skill in the relevant field at the time of the inventions.

36.     For example, the Patent Trial and Appeal Board agreed that the prior art identified by the examiner failed to disclose "communicat[ing] with [a] plurality of diverse point of sale systems." The Patent Trial and Appeal Board also found that the inventions reflect a technology improvement of integrating diverse systems, so that non-compatible data from diverse systems are mapped to a common data model.

37.     The claimed "point of sale agent" is unconventional because it is "configured to map [non-compatible] point of sale data to the common data model."

38.     The combination of the novel "point of sale agent" with more than one existing point of sale systems (that generate data incompatible with one another) is novel and unconventional (hereinafter, "'agent'/'systems' combination").

39.     The "agent"/"systems" combination permits the arrangement of an order manager, database, and diverse point of sale systems in a novel architecture (hereinafter, "Ziegler/Finall Architecture").

40.     The Ziegler/Finall Architecture facilitates online ordering for companies that have incompatible POS systems and easier mergers and acquisitions for companies with incompatible POS systems.

41.     The Ziegler/Finall Architecture also facilitates a faster exchange of information between the order manager and diverse point of sale systems.

42.     A practical benefit from the faster exchange of information between the order manager and diverse point of sale systems is that the architecture can support faster transactions (same-day fulfillment within hours, if not minutes) in part because there is less latency.

43.     Another practical benefit from the two-way exchange of information between the order manager and diverse point of sale systems is a greater degree in confidence in the ripeness of the information maintained in the database, which is populated by information generated by diverse point of sale systems and mapped by the point of sale agent to the common data model provided by the database.

44.     The novel arrangement of the point-of-sale agent, diverse point of sale systems, order manager, and database (the Ziegler/Finall Architecture) was unconventional at the time of its conception.

45.     The novel use and arrangement of the specific combination, steps, system, and devices recited by the '363 Patent were not well-understood, routine, or conventional to a person skilled in the relevant field at the time of the inventions including the combination of steps in Claim 1 of the '363 Patent.

## NATURE OF THE ACTION

46.     Ethor asserts that Menufy and HungerRush infringe, directly and indirectly, U.S. Patent No. 10,460,363 (the "Ethor Asserted Patent").

## MENUFY

47.     Menufy is an e-commerce company that provides a platform for restauranteurs who want to realize greater sales volumes by facilitating online ordering.



48.      HungerRush completed its acquisition of Menufy in October 2021 to bring restauranteurs seamless mobile and online ordering capabilities, with the goal of ultimately empowering them to grow independently and rapidly. *See* https://www.hungerrush.com/newsroom/hungerrush-completes-integration-of-menufy-online-ordering-platform-with-hungerrush-360-marketing/.

49.      "Since bringing Menufy's talent and portfolio into HungerRush, we've furthered our vision of providing customers the talent and technological capabilities needed to thrive in this dynamic industry." Perry Turbes, CEO of HungerRush (https://www.hungerrush.com/newsroom/hungerrush-completes-integration-of-menufy-online-ordering-platform-with-hungerrush-360-marketing/).

50.      HungerRush, based in Houston, Texas, incorporated Menufy's product into HungerRush and the HungerRush platform.

https://www.hungerrush.com/newsroom/hungerrush-completes-integration-of-menufy-online-ordering-platform-with-hungerrush-360-marketing/.

51.      HungerRush and Menufy share customers: "HungerRush 360 Marketing is the ultimate full-service marketing solution for large and small restaurants, allowing them to drive profits by reconnecting with past customers and retaining existing ones by converting them to regular customers with customized offers. We're excited to see the success of the pilot program and look forward to helping more Menufy partners boost their marketing efforts." *See* https://www.hungerrush.com/newsroom/hungerrush-completes-integration-of-menufy-online-ordering-platform-with-hungerrush-360-marketing/

> Wow, things are really heating up here at HungerRush! I'm very pleased to announce that today we have acquired Kansas City-based Menufy which offers online and mobile meal ordering capabilities to restaurant customers in thousands of US cities. Since 2009, Menufy has been helping independently-owned restaurateurs drive both growth and profitability through a compelling online website and mobile app ordering experience designed around a restaurant's brand.
>
> The combination of HungerRush and Menufy now positions HungerRush as one of the market leading cloud SaaS companies in America focused on digitally enabling high growth restaurants. Adding Menufy to our HungerRush 360 software portfolio allows us to bring even more innovative solutions to a customer base of almost 20,000 Quick Service and Fast Casual restaurants. From independents to major brands, HungerRush can enable brands to better scale their businesses, delight their customers, and drive unprecedented control of their own growth and success.
>
> By integrating Menufy's established online food ordering platform with the HungerRush 360 system we will be able to offer Menufy customers new levels of capabilities such as, HungerRush 360 POS, AI driven text ordering, marketing and delivery.
>
> Given our rich history in the restaurant industry we are excited to expand our robust HungerRush team to now include the experienced team at Menufy! I welcome them all, along with CEO Sharmil Desai on this next chapter in the HungerRush journey. We also welcome thousands of Menufy customers to the HungerRush family!
>
> Check out today's press release to learn more!

52.     The Menufy Companies offer solutions for ordering food and other products. For example, their website solution is a customizable browser-accessible interface through which the restauranteur's customers can select menu items, place them in a digital shopping cart, consider promotions and upsell opportunities, and tender payment.

53.     For example, the mobile application solution is a mobile device-accessible interface through which the restauranteur's customers can select menu items, place them

in a digital shopping cart, consider promotions and upsell opportunities, and tender payment.

54.     Menufy touts that its platform easily integrates with leading restaurant point of sale ("POS") systems such as Clover, Square, Shift4 and Shift4 affiliates (including Future POS, HarborTouch, POSitouch, and Restaurant Manager).

55.     The Menufy Companies monetize the Menufy platform by adding a fee (e.g., $1.50) to the total of each order placed on the platform by the restauranteur's customer and retaining all or a portion of that fee before providing the proceeds of the restauranteur's customer's total payment to the restauranteur.

56.     The Menufy platform integrates with point-of-sale (POS) systems, such as Square, Clover, Shift4, and Shift4's affiliates.

57.     HungerRush also realizes additional revenue by offering a "marketing machine" to restauranteurs in exchange for monthly subscription fees. https://www.youtube.com/watch?v=Zvsdzn8ryTA.

58.     The HungerRush "marketing machine" is part of a subscription-based service called "HungerRush 360 Marketing" that is integrated with the online ordering platform and harnesses business insights derived from the restauranteur's customer data, which the HungerRush 360 Marketing functionality, and related functionality, obtains and maintains on behalf of subscribers.

59.     HungerRush "uses real-time subscriber data to eliminate mistakes, provide high-value designs at no extra cost, and report real sales numbers so users can see the results of their program in real time." https://www.hungerrush.com/newsroom/hungerrush-

completes-integration-of-menufy-online-ordering-platform-with-hungerrush-360-marketing/ HungerRush and Menufy are able to harness the power of the non-compatible POS data (e.g., "real sales numbers") to show the benefit of their marketing campaigns.

60.     HungerRush announced that "restaurants that use HungerRush 360 Marketing can double the number of customers placing orders and realize a 7 percent increase in repeat orders, compared to restaurants that do not take advantage of the program." *Id.*

61.     One exemplary Menufy platform user is Dominick's Pizza. https://restaurant.menufy.com/article/dominicks-pizza-hungerrush-360-marketing.

62.     Existing Menufy platform users, such as Dominick's Pizza, were offered "a new integrated marketing tool" that is based on "HungerRush 360 Marketing." *Id.*

63.     The HungerRush 360 Marketing functionality permits Menufy platform users to "86 The Third Parties" or, in other words, to "order directly from the restaurant" via the Menufy platform (instead of through third-party apps)." *Id.*

64.     HungerRush 360 Marketing is offered to prospective and existing Menufy platform users as a "Premium Service" by following the "online marketing services" link.



https://restaurant.menufy.com/pricing

65.     The "online marketing services" link takes prospective and existing Menufy platform users to a page explaining HungerRush 360 Marketing functionality, including embedded videos about Customer Conversion Cards which are printed materials whose purpose is to incentivize restaurant order recipients to place future orders on the Menufy platform.

66.     For example, Menufy platform user bánhwich café upon information and belief uses HungerRush 360 Marketing functionality to send animated image files via text message to bánhwich café customers, and the text messages also contain "ORDER NOW" links to the Menufy platform-hosted bánhwich café online ordering interface.



https://restaurant.menufy.com/article/increasing-repeat-business;

https://www.banhwichcafe.com; and

https://www.banhwichcafe.com/order.

67.    One example of HungerRush 360 Marketing functionality is the "habit booster campaign" touted by the Menufy Companies by which "an MMS message (image + text message) is sent to the customer 46 Hours after they have placed their first direct online order [e.g., an order through the Menufy platform], containing a 2-week promotional offer. **An "ORDER ONLINE NOW" link is included along with a promo code.**" https://restaurant.menufy.com/hr360m-campaigns (emphasis supplied)

68.    Menufy platform users who use HungerRush 360 Marketing have reported "an average of 200 additional orders for the restaurant per month." https://restaurant.menufy.com/article/dominicks-pizza-hungerrush-360-marketing

69.    The HungerRush 360 Marketing functionality influences, and/or is

influenced by, "real-time data" that, upon information and belief, includes some (or all) of the "marketing info, online ordering reports, and analytics all in one familiar place, the Menufy manager portal." *Id.*

70.     The Menufy products and services accused in this case include the Menufy app (available on the Apple App Store and the Google Play store), the Menufy website, and all other Menufy platform products that include POS data-mapping features as stand alone products and integrated into the HungerRush platform and all other similar products ("Menufy Accused Products").

71.     The Menufy Accused Products allow users to select from many restaurants and place orders for food and products even when they are operated by separate parties. The Menufy platform integrates multiple diverse point of sale systems that generate non-compatible point of sale data such as Bombay Bistro (Austin, TX) which upon information and belief uses Square POS systems and Suphan Thai (Virginia Beach, VA) who upon information and belief uses Clover POS systems.



https://bombay-bistro-lamar.menufy.com/



https://suphanthaicuisine.menufy.com/order

72.      The Menufy platform provides integrations with point of sale platforms.



https://support.menufy.com/hc/en-us/articles/360004157412-Do-you-offer-Point-of-

Sales-POS-integration-for-restaurants-



https://restaurant.menufy.com/square



https://www.youtube.com/watch?v=mmKspQhuwsQ ("How Menufy Works").

73.     Menufy Companies provide restaurants with content management in real-time including orders and inventory availability.



https://manage.menufy.com/



https://restaurant.menufy.com/article/new-curbside-pickup-features



The Menufy and Square partnership enables restaurants to connect their POS with online ordering service to:

- **Fully control the restaurant's online menu**
- **Synchronize inventory automatically**
- **Streamline bookkeeping**

https://restaurant.menufy.com/square

Simple is the recommended default option.

Sync: **Simple**

Advanced mode should only be used if your restaurant is incapable of making modifier changes to your Clover system.

Sync: **Advanced**

This table shows the differences.

|  | Simple | Advanced |
|---|---|---|
| Edit names displayed online | X | X |
| Hide categories | X | X |
| Hide items | X | X |
| Hide modifier groups | X | X |
| Hide modifier groups by item |  | X |
| Hide modifiers |  | X |
| Set modifier group min/max |  | X |
| Sync inventory counts | X |  |
| Sync frequency | **Near Realtime** | **Every 6 Hours** |

https://support.menufy.com/hc/en-us/articles/360042614651-Clover-Sync

## Change Item Prices

**POS Integration Users**: Your Menufy menu prices are pulled from your POS Device. For information on how to update your Clover menu, see Clover Menu Help.

https://support.menufy.com/hc/en-us/articles/360009530591-How-can-I-update-my-Menufy-menu-

74.     Menufy Companies realize substantial value from using the subject matter claimed in the Asserted Patent in its products.

### COUNT 1
### (INFRINGEMENT OF U.S. PATENT NO. 10,460,363)

75.     Ethor realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

76.     Ethor is the owner, by assignment, of U.S. Patent No. 10,460,363 (the "'363 Patent") (Exhibit A).   The '363 Patent was issued by the United States Patent and Trademark Office on October 29, 2019.  *See* Exhibit A.

77.     As the owner of the '363 Patent, Ethor holds all substantial rights in and under the '363 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

78.     The '363 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

79.     Ethor alleges that Menufy Companies have infringed, and continue to infringe, the '363 Patent.

80.     Each of the Menufy Companies makes, uses, offers to sell, sells, and/or

imports products and services that infringe the '363 Patent.

81.     The Menufy Companies have directly infringed at least claims 1, 2, 3, 9, 10, and 11, of the '363 Patent by using (including its own testing), making, selling, offering for sale, licensing, and/or importing into the United States without authority the Menufy Accused Products.

82.     The Menufy Accused Products include a first computer processor in communication with the plurality of diverse point of sale systems.

83.     For example, upon information and belief, the Menufy platform comprises at least one processor from Microsoft Azure.

84.     The Menufy platform is touted as integrated with multiple POS systems, such as Square-branded POS systems and Clover-branded POS systems.

85.     Each diverse point of sale system (with respect to which the first computer processor in the Menufy Accused Products is in communication) generates non-compatible point of sale data.

86.     For example, point of sale data generated from Square-branded POS systems are not compatible with point-of-sale data generated from Clover-branded POS systems.

87.     The first computer processor in the Menufy Accused Products is configured to communicate with each of the plurality of diverse point of sale systems using a point-of-sale agent.

88.     For example, the first processor used in the Menufy platform is configured

to execute instructions (programs, modules, routines, subroutines, coroutines, threads, daemons, services, or the like) comprising an agent that facilitates the processor's communication with (as one example) a Square-branded POS system.

89.     The Menufy Accused Products include a second computer processor linked to the first computer processor.

90.     For example, upon information and belief, the Menufy platform comprises at least two processors from Microsoft Azure.

91.     The Menufy processors are linked at least because the absence of such linking would preclude the Menufy platform from providing real-time content management functionality.

92.     The second computer processor in the Menufy Accused Products is configured to operate an order manager.

93.     For example, the second processor from Microsoft Azure used in the Menufy Accused Products is configured to execute instructions (programs, modules, routines, subroutines, coroutines, threads, daemons, services, or the like) that comprise a manager that facilitates the processor taking orders (as one example, taking a $4.00 order for Mattar Pilaf from Bombay Bistro on South Lamar Blvd. in Austin, Texas, that originated from the Menufy mobile application that Menufy distributes and encourages end-users to use).

94.     The Menufy Accused Products include a memory storage unit for storing a point-of-sale database.

95.     For example, upon information and belief, the Menufy platform comprises at least one memory storage unit accessed by, accessible from, or provided by, Microsoft Azure.

96.     The point-of-sale database stored in the memory storage unit in the Menufy Accused Products provides a common data model configured to be recognized by the order manager.

97.     For example, product data displayed by the Menufy mobile application is standardized to include description, price, category, and other point of sale data.

98.     The second processor which is configured to operate the order manager recognizes the standardized data regarding point of sale as shown by use of "Location Id" information in Menufy browser-accessible scripts (for example, Bombay Bistro on South Lamar Blvd. in Austin, Texas has a "Location ID" of 543 while Suphan Thai in Virginia Beach, VA, has a "Location ID" of 32899). The standardized data used by the Menufy platform also includes data bearing the "category-item-name" label (for example, "Mattar Pilaf" data), data bearing the "category-item-description" label (for example, a description of the Mattar Pilaf as "*Gluten Free* Basmati rice and green peas, fragrantly flavored"), and data bearing the "category-item-price" label (for example, the price of Mattar Pilaf as $4.00).

```
▼<div class="category-item-name">
    " Mattar Pilaf  "
  ▶<span class="item-tags">…</span>
</div>
<div class="category-item-description">*Gluten Free* Basmati rice and
green peas, fragrantly flavored.</div>
<div class="category-item-price mt-auto"> $4.00 </div>
```

https://bombay-bistro-lamar.menufy.com/

99.    Upon information and belief, the Menufy platform obtains information from POS systems and stores the information in a standardized format so that the standardized information can be accessed in a database. That standardized information is used by the Menufy platform to generate, among other things, the browser-accessible scripts that display the browser-accessible interface (such as the Bombay Bistro "order online" website) through which restaurant customers can consider and place restaurant orders.

100.    The common data model provided by the point of sale database stored in the memory storage unit in Menufy Accused Products includes fields corresponding to at least one of a point of sale system identifier, pricing, and promotions.

```
▼<div class="category-item-name">
    " Mattar Pilaf  "
  ▶<span class="item-tags">…</span>
</div>
<div class="category-item-description">*Gluten Free* Basmati rice and
green peas, fragrantly flavored.</div>
<div class="category-item-price mt-auto"> $4.00 </div>
```

https://bombay-bistro-lamar.menufy.com/

101.    For example, the data ascertainable from the Bombay Bistro "order online" website comprises data identifying at least one restaurant and data identifying item details, inventory availability and pricing.

102.    The data ascertainable from the Bombay Bistro "order online" checkout page comprises data bearing the "promo-optin" label relating to promotions.

```
▼ <fieldset class="promo-optin" style>
    <legend>Text & Email Notifications</legend>
  ► <div class="top-buffer">…</div>
  </fieldset>
```

```
Text & Email Notifications

☐   Yes. I'd like to receive text and email deals from Bombay Bistro on South Lamar Boulevard. See privacy policy. Opt out at any
     time.
```

https://bombay-bistro-lamar.menufy.com/

103.    Upon information and belief, standardized stored information regarding

promotions is accessible and modifiable by restauranteurs who use the Menufy platform,

and it may be accessed and modified through the "Discounts & Deals" tab on the Menufy

Manager portal:



https://restaurant.menufy.com/article/new-curbside-pickup-features

104.    The point-of-sale agent in the Menufy Accused Products receives the non-compatible point of sale data from each of the plurality of diverse point of sale systems and the order manager.

105.    For example, the first processor that executes instructions (programs, modules, routines, subroutines, coroutines, threads, daemons, services, or the like) comprising an agent receives data from (as one example) a Square POS system that is

not compatible with a Clover POS system.

106.    The first processor that executes instructions (programs, modules, routines, subroutines, coroutines, threads, daemons, services, or the like) comprising an agent receives data from the second processor that executes instructions (programs modules, subroutines, coroutines, threads, daemons, services, or the like) comprising a manager that facilitates the second processor taking orders.

107.    The point-of-sale agent in the Menufy Accused Products is configured to map the point-of-sale data to the common data model.

108.    For example, the Menufy platform exhibits the functionality of searching for specific categories of food (such as Thai) from multiple points of sale and returning information regarding points of sale that fulfills that criterion (e.g., restaurants that are presently offering Thai food).

109.    The search functionality in the Menufy Accused Products relies upon the data being standardized into fields capable of being searched (such as a field corresponding to products).

110.    Data originating from (as one example) Square POS systems and Clover POS Systems maps to corresponding data that is standardized on the Menufy platform.

111.    The order manager in the Menufy Accused Products comprises an order interface for receiving input from a consumer.

112.    The order manager in the Menufy Accused Products includes an order interface for consumers to input orders and interact with multiple, diverse point of sale

systems. For example, the user can view and input orders from restaurants that have Clover, Square, or other POS systems.

113. For example, a processor from Microsoft Azure used in the Menufy platform is configured to execute instructions (programs, modules, routines, subroutines, coroutines, threads, daemons, services, or the like) that comprise a manager (which facilitates the processor taking orders) comprising instructions (programs, modules, routines, subroutines, coroutines, threads, daemons, services, or the like) that comprise an interface that facilitates the receipt of data from end users.

114. The interface of the order manager in the Menufy Accused Products receives input from a consumer that is configured to make purchases corresponding to point of sale data.

115. For example, a processor from Amazon Web Services used in the Menufy platform is configured to execute instructions (programs, modules, routines, subroutines, coroutines, threads, daemons, services, or the like) that comprise a manager (which facilitates the processor taking orders) and interface that facilitates the receipt of purchase data (*e.g.*, a $4.00 purchase of Mattar Pilaf) from end users that corresponds to data regarding a point of sale (*e.g.*, an Mattar Pilaf product made available using a point of sale corresponding to Bombay Bistro on South Lamar Blvd. in Austin, TX).

116. Menufy maps non-compatible point of sale data communicated by each diverse point of sale system of the plurality of diverse point of sale systems to a common data model (the common data model including fields corresponding to at least one of a

point of sale system identifier, pricing, and promotions) configured to be recognized by an order manager at least because the point-of-sale agent in the Menufy Accused Products is configured to map the point-of-sale data to the common data model.

117.    Menufy communicates, using one or more point of sale agents, the point of sale data between each diverse point of sale system of the plurality diverse point of sale systems and the order manager in accordance with the common data model at least because the point-of-sale agent in the Menufy Accused Products receives the non-compatible point of sale data from each of the plurality of diverse point of sale systems and the order manager.

118.    Menufy maps non-compatible point of sale data communicated by each diverse point of sale system of the plurality of diverse point of sale systems to a common data model (the common data model including fields corresponding to at least one of a point of sale system identifier, pricing, and promotions) configured to be recognized by an order manager at least because the order manager in the Menufy Accused Products comprises an order interface for receiving input from a consumer and includes an order interface for consumers to input orders and interact with multiple, diverse point of sale systems. For example, the user can view and input orders from restaurants that have Clover, Square, or other POS systems.

119.    Menufy and HungerRush have used and/or tested the Menufy Accused Products in the United States.

120.    Each of the Menufy Companies thus has infringed and continues to infringe the '363 Patent.

121.    Each of Menufy and HungerRush's activities were without authority of license under the '363 Patent.

122.    Upon information and belief, each of Menufy and HungerRush acts of infringement of the '363 Patent continue since they received notice and since this complaint was filed and are, therefore, carried out with knowledge of the asserted claims of the '363 Patent and how the Menufy Accused Products infringe them.

123.    Since at least receipt of notice and the filing of this action, Menufy and HungerRush have been aware of the unjustifiably high risk that its actions constituted and continue to constitute infringement of the '363 Patent, and that the '363 Patent is valid.

124.    Menufy and HungerRush encourage others to infringe the '363 Patent at least because they provide active customer support for the Menufy Accused Products.

125.    Menufy and HungerRush direct their respective customers to cause the claimed methods to be performed in the United States.

126.    Menufy and HungerRush encourage restaurant customers to download the Menufy app on the Apple Store or the Google Play Store, place orders and use the Menufy app and the Menufy platform. Menufy and HungerRush provide customer support to Menufy platform users, including a support line accessible from the Menufy Manager portal:



https://restaurant.menufy.com/article/new-curbside-pickup-features

127.      HungerRush encourages Menufy platform-using restauranteurs to save money by redirecting potential orders to the Menufy platform and diverting those potential orders from being placed on costlier third-party sites.



https://restaurant.menufy.com/hungerrush-360-marketing

128.    HungerRush 360 Marketing functionality harnesses real-time information regarding orders that is stored on, or accessible from, the Menufy platform. HungerRush derives subscription-based revenue from Menufy platform users.

129.    Upon information and belief, every time a restaurant customer receives a text message by operation of the HungerRush 360 Marketing functionality, HungerRush induces the text message recipient to use the patented system.

130.    Every time a restaurant customer receives a physical card provided by HungerRush to the restaurant for the express purpose of directing future orders to a Menufy website, HungerRush induces the card recipient to use the patented system.

131.    Every time a restaurant customer receives a text message by operation of the

HungerRush 360 Marketing functionality, HungerRush offers the text message recipient an unauthorized license to use the patented system in exchange for a fee payable to its subsidiary entity (currently $1.50 to Menufy).

132.    Every time a restaurant customer receives a physical card provided by HungerRush to the restaurant for the express purpose of directing future orders to a Menufy website, HungerRush offers the card recipient an unauthorized license to use the patented system in exchange for a fee payable to its subsidiary entity (currently $1.50 to Menufy).

133.    Menufy and HungerRush's acts of direct and indirect infringement have caused and continue to cause damage to Ethor for which it is entitled to recover damages sustained as a result of Menufy and HungerRush infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## NOTICE OF REQUIREMENT OF LITIGATION HOLD

134.    Menufy and HungerRush are hereby notified that they are legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that any or all of Menufy, and/or HungerRush knows, or reasonably should know, may be relevant to actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy form or in the form of electronically stored information (hereafter collectively referred to as "Potential Evidence").

135.    As used above, the phrase "electronically stored information" includes without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable e-mails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored.  These sources may also include any personal electronic, digital, and storage devices of any and all of the Menufy Companies' agents, resellers, distributors or employees if any or all of Menufy's, and/or HungerRush's electronically stored information resides there.

136.    Each of the Menufy Companies is hereby further notified that any alteration, destruction, negligent loss, or unavailability, by act or omission, of any Potential Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to any or all of Menufy's, and/or HungerRush's claims and/or defenses.  To avoid such a result, each of the Menufy Companies' preservation duties include, but are not limited to, the requirement that Menufy and/or HungerRush

immediately notify its respective agents, distributors, and employees to halt and/or supervise the auto-delete functions of any or all of Menufy's, and/or HungerRush's electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion.

## JURY DEMAND

Ethor hereby demands a trial by jury on all claims, issues, and damages so triable.

## PRAYER FOR RELIEF

Ethor prays for the following relief:

a. That Menufy and HungerRush be summoned to appear and answer;

b. That the Court enter an order declaring that Menufy and HungerRush have infringed the Asserted Patent;

c. That the Court grant Ethor judgment against Menufy and HungerRush, for all actual, consequential, special, punitive, increased, and/or statutory damages, including, if necessary, an accounting of all damages; pre- and post-judgment interest as allowed by law; and reasonable attorney's fees, costs, and expenses incurred in this action;

d. That Menufy and HungerRush be held jointly and severally liable; and

e. That Ethor be granted such other and further relief as the Court may deem just and proper under the circumstances.

Dated:  March 10, 2023

Respectfully submitted,

**CONNOR LEE & SHUMAKER PLLC**

By:   _/s/ Jennifer Tatum Lee_
Jennifer Tatum Lee
jennifer@CLandS.com
Texas Bar No. 24046950
SDTX Bar No. 1114389
Cabrach J. Connor
cab@CLandS.com
Texas Bar No. 24036390
SDTX Bar No. 399291
Sergio R. Davila
Sergio@CLandS.com
State Bar No. 24079795
SDTX Bar No. 1428795

609 Castle Ridge Road, Suite 450
Austin, Texas 78746
512.646.2060 Telephone
888.387.1134 Facsimile

**Attorneys for Plaintiff Ethor IP
Corporation**